Good morning, Your Honors. I'm Jackie Jura, representing the claimant, Mrs. Seltz. And I'll be presenting the main arguments. My colleague, Mr. Baird, will be presenting on rebuttal. I'm planning to take about seven minutes and then reserve the rest. This is a pretty straightforward case. It has to do with the claimant's blue hands. If the court finds that a claimant with cold, blue, painful, numb, and operable hands cannot work as a production assembler, this court should find this claimant disabled. At the hearing, the ALJ noted that the claimant's hands were blue and asked the claimant about them. The claimant responded that her hands hurt, she woke up with them numb, she was not able to use them for repetitive activities, and that they were cold. In discrediting the claimant, the ALJ relied on broad factors such as inconsistent reporting, the medical evidence, but the ALJ critically did not reject the particular complaints that this claimant made with respect to her cold, blue, painful, numb, and operable hands. But didn't she at some point, I thought the record, at some point she said that that was due to the fact that she had frostbite years before or something? She did, but under the credibility analysis, the ALJ was still required to specifically refute each of the claimant's specific statements. And the claimant went into great detail with respect to different factors with respect to her inoperable hands and went on and on about them. So a broad, the claimant's just saying that could have been with respect to frostbite, didn't really resolve the issue. The ALJ had a duty to determine or develop the record with respect to what was causing her hands to be blue. Now, of course, that could have been the oxidation, the deoxidation from the COPD, but that was never really determined. The record needed to be developed at greater length. Is this an argument that you made in your brief? I'm sorry, I didn't hear you. Is this an argument that was made in your brief? Specific argument, the argument that he should have inquired further as to her hands. Is that an argument that was made in the brief? Yes, all of these issues were covered in the brief. Where? They are in the brief. Okay. Check with your co-counsel, he's kind of marked. Okay. At pages 23 through 27. Who is Dr. Price? Dr. Price was a state, he was from the state. He's a neurologist? No, he's not. I don't see it the place that you mentioned this argument. I mean, the argument I understand you should be making now is that aside from reliance on or non-reliance on the treating doctors and so on, the appearance of her hands should have led to a further inquiry. And I don't see that argument in the briefs. Well, the key there is that the hands were evident to the ALJ. There's a case that's Saleha v. Barnhart where a claimant walked in who was obese. The ALJ did not consider the effects of that obesity. And the court held in that case that notwithstanding the fact that that claimant who was obese did not specifically allege obesity because the ALJ personally observed that claimant to be obese, that they had a duty to consider the effects of that obesity. Let me get back to Dr. Price. He is, if I understand it, a neurologist who examined his cells. Dr. Price was a state agency. Yeah. But he saw it. He saw the claimant on one occasion. But what we have in this case. And found no neurological disorder. That is correct. Why isn't the ALJ entitled to rely on that? Well, Your Honors, all the treating physicians in this case, all the treating physicians rated this claimant's severity of her myasthenia gravis to be severe. For example, Dr. Zimmerman. He treated the claimant. He observed easy fatigability. He rated her myasthenia gravis at a severity level three. That is an interference. That was defined as interference with basic work activities. Is that based on her subjective report? Or were there any objective data for that? It is his opinion. And this is someone who was treating. Did he base it on her subjective complaints? Or did he find anything clinical to hang his hat on? He treated her over a period of time. And he found that. He found that the interference with basic work activities, that's the very definition of severity in the regulation, is interference with basic work activities. I guess what I'm asking is, did he find anything objective, or is this based on her subjective report? I would imagine that he took everything into effect. I don't think I'm hearing that. I mean, you don't have to put on a certain hat to say, okay, I'm giving my opinion. Did he run tests and say, gee, it came back that she's got this or that? He was treating her over a period of time. He did give her medication for myasthenia gravis, right? I'm sorry? He did give her medication for myasthenia gravis. He did. And it seemed to make some difference in her functioning. It did, Your Honor, but with respect to the ñ a critical issue is that this claimant could not afford the Imiron. That costs $130. He said that at the meeting, I mean at the ALJ hearing. Under Gamble, treatment that a claimant can't afford is not treatment for ñ is not available treatment for purposes of severity and disability assessment. My point was instead that he obviously did believe she had myasthenia gravis because he was treating her for it and giving her medication for it. Yes, absolutely. He was giving her medication. Also, the fact that he rated her at a severity level 3 for the myasthenia gravis, that interference with basic work activities, because it's the precise definition in the regulations, the myasthenia gravis should, based on that, have been risen to severe. And that was a concurring opinion that Dr. Yahn had, Mr. Hardy had. Then treating neurologist Johnson also observed immediate, if mild, fatigue. You said you wanted to reserve three minutes. Okay, I'll wrap up. Dr. Johnson found that this claimant could not realistically work and earn a living, and that had to do with her ability to sustain eight hours a day, 40 hours a week. It was not the intensity of the fatigue, but rather the readiness of her fatigue. And critically, all of these things should have been taken together. Here the ALJ erred in not finding the myasthenia gravis severe, not evaluating the affordability of these drugs, not factoring some degree of fatigue or sustainability limitations, taking these things into combination.  So I'll reserve the rest of my argument for Regardle. Thank you. Good morning. Good morning. I'm Nancy Michelletti for the commissioner. I'm just going to slide this back slightly. May it please the Court. The ALJ's decision was supported by substantial evidence, and this Court should affirm the agency decision for three reasons. First, there's a lack of objective findings to support the severity that Ms. Seltz claims. Second, there were numerous inconsistencies in her reporting in the record. And third, her symptoms are controlled by medication. First, even on the very first neurological exam with Dr. Johnson, he found only mild fatigability of some of her hands and shoulder muscles, and then he started her on a trial of mestinon. She couldn't handle the mestinon because of her stomach problems, so he switched her to Imarin. The Imarin worked at the health clinic in January of 2003. She told the doctor that her new medicine for, and I'm going to shorten it to MG rather than saying myasthenia gravis every time, said that the medication for MG was working and her fatigue was not that bad. If I couldn't afford it and I couldn't take it, then it didn't really matter whether it would work if she could take it. Well, Your Honor, she could afford it because this goes to the other inconsistencies with her reporting in the record. She reported that she couldn't afford it. On the other hand, she was using crack cocaine and heroin during that time, and so she could afford to buy drugs. She could certainly afford to pay for her medication. Jumping ahead to those inconsistencies in the record, on July 16th of 04, she told Dr. Price, the neurologist that you just spoke of, that she was treated for cocaine use in 1992 and she hadn't used since then. Then just 12 days later, on July 28th, she told Dr. Mines, who was another consultative examiner, that she developed a cocaine habit in 1984, but then she quit in November of 2002. But the record shows that on May, in May 2003, that she was still using crack cocaine and heroin. So for her to say that she can't afford treatment, it really, it's not consistent. The Imarin was actually working. She even said that she didn't need to go back to Dr. Johnson anymore. She said that... And she didn't, in fact, go back. And she didn't. In fact, she said she had no need to go back to Dr. Johnson anymore, that she hadn't been back since 2003, because all she did was just get her prescription filled. It's just once a year. I haven't had anything out of the usual for it, and I haven't had the need to go back in. And that's in the record in the SER at 408 and 09. Her own testimony shows that her symptoms were controlled by medication. And this court recently affirmed a credibility determination where the ALJ pointed to the claimant's own testimony, that his diabetes was not a disabling problem, was controlled by medication, and was not the reason that he stopped working. That was in Thomas Eddy at 533 F. 3rd, 1035 at 1040. And it's not cited in my brief because it came out in July of 2008. But this court said that the claimant's own testimony undermined his claims, that his diabetes was disabling, and so here Ms. Seltz's own testimony undermines her claim that her MG is disabling. Talking about the blue hands, the ALJ noticed and said, gosh, your hands look bluish in color. What is that? And she said, oh, yeah, I've got poor circulation. This is January in Seattle. It's cold. She's a smoker. So certainly that's going to affect her circulation. The ALJ is not under an obligation to send her out for yet another consultative examination because when she went to see Dr. Price, Dr. Price performed the neurological examination that she just talked about, and on sensory exam she could readily differentiate heads from tails on a penny, and she demonstrated symmetric, fine motor control bilaterally. Even at her examination with Dr. Johnson in July of 2003, again, it was a normal examination. All of her examinations yielded normal results on physical testing and strength testing. And in July of 2003, he also added in there no weakness on repetitive grip or other strength testing. The record simply doesn't support the claimant's, rather, Ms. Seltz's claims that she had problems with her hands. She never told anybody. She never told Dr. Johnson. She didn't tell Dr. Price, and actually Dr. Price asked her at the end of the examination, he says, is there anything else about your physical condition that I should know? Is there anything that I need to examine? And she said there was nothing. One of the other tests that he did is the gait and station test, and she could maintain single leg stance and she could tandem balance with her eyes closed. She also squatted fully and recovered independently. Another doctor at the health clinic noted that she was quite agile getting onto the examination table. She showed no muscle weakness. Strength was equal in all extremities. She had normal gait. Every examination in the record, every physical examination yields normal results, and they do not support her claims. There were some other inconsistencies in the record besides the use of drugs, and at the hearing in May of 2004, Ms. Seltz said that she didn't apply for unemployment benefits after she was laid off from the Home Depot. She said she didn't qualify, but then she later, at the same hearing, admitted that she had gotten unemployment benefits when the ALJ pointed out that her testimony was inconsistent with the form that she filled out. And by the way, in Washington State, a claimant must be able to work and must be available to work if you're collecting unemployment benefits. If the court wants to cite for that, I have the revised code of Washington. Another inconsistency was when the ALJ asked her if she had gone back to work. She said she went back to work as a cashier at the Home Depot and asked her why she had only worked for a month. She said she was laid off. She said there was a big layoff. They closed the store. They laid off half the employees. I was just laid off. But then later in the testimony, she claimed that she was laid off because she couldn't concentrate. She was even inconsistent about what year she was born in. She said that she was born in 1952, making her two years older on both her application and in her testimony at the first hearing. But the ALJ at that point noted that the record showed 1954. And why would she do that? Because the age, how did the age benefit her? It could put her into a different category, make her two years older. But then at the next hearing, her attorney said that she was born in 1954 and somehow that the 1952 got into the record. But the way it got into the record was with Ms. Seltz testifying at the hearing that her birthday was 1952. Well, two things. It could show that she really is very confused and support her claim of disability, or it could show that she had some motive. That's what I was trying to understand. Well, actually, in the testimony, her attorney explained to the ALJ that there was some discrepancy when she was 15 years old and she got married and her mother said that, I guess, swore that she was older, swore that she was 17, and so she's been going by that age ever since. This court is allowed to draw inferences logically flowing from the evidence, and the evidence shows that the ALJ's credibility determination is amply supported by evidence. And all of the findings, I would ask that this court affirm the ALJ's decision because substantial evidence supports it. Thank you. Your co-counsel left you about two minutes. Good morning, Your Honors. I'm Jeffrey Baird representing Mrs. Seltz. The severity standard is low and the credibility standard is high. Those are settings made by this court as well as the Supreme Court. The severity standard is set to rule out groundless claims, frivolous claims. Here the myasthenia gravis claim is far from groundless, far from frivolous, and there's certainly periods of time, stretches of over a year even, with Dr. Johnson, for example, where her physicians are saying it is severe, it does exist, it's level three, which says impedes basic work activities. So even without saying it's disabling, whether alone or in combination with others, we don't need to reach that for a remand here. That severity standard hasn't been applied properly. That's from Boland v. Yuckert or this court in the Webb case. Also, yes, ma'am. Did the ALJ completely disregard the myasthenia gravis or he simply found that it was not? That's another error, isn't it? The ALJ found it non-severe specifically and then did not include its non-severe quantum in the total evaluation of the combination of impairments. That's still the obligation under step two and three. The ALJ has to take into account even non-severe impairments. And here we had a string of them, each of which added increments of fatigue, one would think, and Ms. Seltz testified. So that the myasthenia gravis gives broad muscle fatigue, voluntary muscle fatigue, the restless leg syndrome maybe interrupts sleep, the COPD and breathing, again, may well interrupt sleep or cause fatigue. All taken together, there's a set of increments that come from each of these impairments, even if they don't quite reach the severity standard. But I think the myasthenia gravis did reach it. Dr. Johnson's opinion is important. He noted mild fatigue on testing. That's immediate fatigue. And he had deep concerns about the realisticness of carrying on with the work. So thank you. Thank you very much. Thank you both counsel, all three counsel. The case has started. It is submitted. Good morning. 0735587 Yarger v. Astrid. Each side has ten minutes. Thank you.
judges: Silverman, Berzon, Mahan